## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re: | Case No. A15-00210-GS |
| CORBETT JAMES BEACH, III, | Chapter 7 |
| Debtor. | |
| DELOYCHEET, INC., | Adv. No. A15-90016-GS |
| Plaintiff, | |
| v. | |
| CORBETT JAMES BEACH, III, | |
| Defendant. | |

## <u>MEMORANDUM DECISION</u>

In this adversary proceeding, plaintiff Deloycheet, Inc. ("Deloycheet") seeks to establish and except from discharge a $400,000 debt that arose as a consequence of the actions taken by the defendant, and debtor, Corbett James Beach, III ("Beach"), on the grounds of fraud, under 11 U.S.C. § 523(a)(2)(A), and willful and malicious injury under § 523(a)(6).[1] Deloycheet also seeks an award of treble damages under the Alaska Unfair Trade Practices Act ("UTPA"), punitive damages, and an allocation of fault between Beach and another individual, Trudy Sobocienski, who is not a party to this action.

The court has considered the testimony and exhibits offered by the parties at trial. For the reasons stated herein, the court finds in favor of the plaintiff on its § 523(a)(2)(A) count and

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

its claim for damages under the UTPA.  Punitive damages will not be awarded.  The court shall dismiss the plaintiff's § 523(a)(6) claim, with prejudice.

A.    **FACTS**[2]

1.    **Organization of Plaintiff Deloycheet Inc.**

Deloycheet is an Alaska Native Village Corporation located in Holy Cross, Alaska on the Yukon River.[3]  It was formed under the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. § 1606 *et. seq.* ("ANCSA"), and conducts business through its two subsidiaries.  The first is Holy Cross Oil, Inc. ("HCO"), who has traditionally sold fuel and materials to the Holy Cross community.  The second subsidiary is Deloycheet Development Corporation, Inc. ("DDC"). DDC was formed in 2010 to help HCO utilize its status as an 8(a) contractor in the Small Business Administration's Business Development Program, which is designed to foster small business development in government contracting.

Deloycheet is governed by a nine-member board of directors, and its subsidiaries are each governed by smaller boards whose members are appointed by Deloycheet's board of directors.[4] During the time period applicable to this proceeding, Eugene Paul ("Paul") was the president of Deloycheet's board of directors, and Chanda Aloysius ("Aloysius") was one of the board members.  Aloysius testified that the Deloycheet board sets the direction of the company, but is not involved in daily business operations.  The board relies heavily on corporate management to run the businesses on a day to day basis.

Deloycheet holds board meetings periodically throughout the year to review the corporation's financial information and budget, and to consider any items or transactions placed

---

[2] The transaction that gave rise to Deloycheet's § 523(a) claims occurred in May 2012.  This detailed statement of facts is required, however, because events germane to that transaction occurred as early as mid-2011.

[3] *Stipulated Facts*, ECF No. 34, ¶ 1.

[4] *Id.*, ¶ 2.

on the agenda by its staff.  According to Aloysius, if management wanted Deloycheet to enter into a transaction, the item would be placed on the board of directors' agenda, and an informational packet would be sent to the board members to review before the meeting. Management would then present the proposal at the board meeting, and the board would vote on whether to approve it.  Under Deloycheet's bylaws, corporate officers generally are not authorized to sign contracts or other instruments absent approval of the board; further, no loans may be contracted on the corporation's behalf absent prior approval of the board.[5]

Historically, Deloycheet was able to generate a small profit from HCO, but relied upon monies received yearly under Section 7(j) of ANCSA.  According to Aloysius, the 7(j) funds are received annually in May.  The amount received ranges between $300,000.00 and $750,000.00, but averages $500,000.00.

### 2.    Defendant Beach is Hired by Deloycheet.[6]

Trudy Sobocienski served as Deloycheet's chief executive officer from August 2010 until May 2012.[7]  Her job duties were to manage Deloycheet's two subsidiaries and to develop new business operations to increase business revenues.  To further these goals, in early 2011 DDC advertised for an executive vice president of business development.  The written job qualifications for this position required "a senior business development executive who can

---

[5] Pl.'s Ex. 93, Am. and Restated Bylaws of Deloycheet, Inc., at D01119 (Article IV.6), D01122 (Article VI.2).  Article VI.2 specifically provides that "[n]o loans shall be contracted on behalf of the corporation and no evidence of indebtedness shall be issued in its name unless authorized by a resolution or unanimous written consent of the Board of Directors.  Such authority may be general or confined to specific instances."

[6] The parties have stipulated that Beach was "Deloycheet's Executive Vice President for Business Development from mid-2011 until May 2012."  *Stipulated Facts*, ECF No. 34, ¶ 4.  However, the position announcement for Beach's position named DDC as the employer, as did Beach's Employment Contract.  *See* Deft.'s Exs. A, B.  For the purposes of this decision, this distinction is immaterial.  Beach changed his employment capacity in February 2012 and became an independent "professional manager" for Deloycheet. *See* Pl.'s Ex. 41.

[7] *Stipulated Facts*, ECF No. 34, ¶ 3.

3

identify potential deals and develop the tactics and teams to bring them to fruition."[8]  DDC sought someone with "10 years plus of demonstrated success in business development, marketing, and/or sales," and "[e]xperienced [in] marketing or selling products or services in a start-up or early stage environment."[9]

Defendant Beach was hired by DDC in mid-2011 to fill this position.[10]  His starting annual salary was $120,000.00, and he was eligible for annual performance incentive bonuses under certain circumstances.[11]  Beach testified that his job was to build business for DDC.  Yet, his hiring was somewhat at odds with the qualifications sought, as he lacked a college degree and had a sporadic history in business.[12]  He had no prior experience working with Alaska Native corporations, nor did he have any knowledge of 8A contracting.  However, Sobocienski, who was Beach's immediate supervisor, was knowledgeable in both areas, and was tasked with bringing Beach up to speed.

Beach's employment contract required him to "devote his full time, attention, and best efforts to the business and affairs" of DDC.[13]  It further prohibited him from engaging in "any other business activity, whether or not such business activity is pursued for gain, profit, or other pecuniary advantage."[14]  He was employed "at will."  A termination clause in the agreement

---

[8] Deft.'s Ex. A.

[9] *Id.*

[10] At trial, Aloysius asserted Sobocienski was the one who brought Beach on, while Sobocienski said Aloysius was the one who hired Beach.

[11] Deft.'s Ex. B (Employment Agreement),  ¶¶ 5.1, 5.2.

[12] Beach was working as a youth pastor at the time he applied for the position with DDC.  At the time of trial, he had resumed this work and was also employed as a car detailer.  He did testify that he had worked as a chief executive officer for a renewable energy company and as a marketer for a couple of other energy companies prior to working for DDC.

[13] Deft.'s Ex. B,  ¶ 3.

[14] *Id.*

provided that if DDC terminated Beach without cause, he would be entitled to severance pay equal to six months' salary.[15]   However, he was not entitled to severance pay if he voluntarily terminated the contract, or if he was terminated for cause.

### 3.    Deloycheet's Teaming Agreement with Sylvain Analytics.

At the time Beach was hired, Deloycheet had entered into a Teaming Agreement with Sylvain Analytics, Inc. ("SAI"), an 8(a)-certified veteran and minority-owned small business located in Reston, Virginia[16]   SAI offered analytics business services and data management to federal agencies under government contracts.[17]   Ray Sylvain ("Sylvain") was SAI's President and Chief Executive Officer.[18]

Sobocienski had met Sylvain at an 8(a) government contracting conference in early 2011.[19]   She signed the Teaming Agreement with SAI on behalf of Deloycheet on May 10, 2011. Under this agreement, the parties established a "team solely to seek opportunities and to provide deliverables" on professional service contracts they hoped to offer to certain governmental agencies, including the Department of Health and Human Services, the Department of Interior, and the Department of Justice.[20]   Although the agreement contemplated that Deloycheet and SAI would work as a team, neither party was authorized to  make commitments on behalf of the other

---

[15] *Id.*, at  ¶¶ 6.2, 6.3.  Receipt of the severance pay was conditioned on Beach's execution of a full release "prepared or approved" by DDC.  *Id.*, ¶ 6.3.

[16] Pl.'s Ex. 2.

[17] *Stipulated Facts*, ECF No. 34, ¶ 5.

[18] *Id.*

[19] *Id.,* ¶ 8.

[20] Pl.'s Ex. 2, at 1-2.  Under the Teaming Agreement, the parties planned to approach the Department of Health and Human Services, the Department of Interior, and the Department of Justice "to secure contracts for . . . professional services and business solutions." *Id.* at 1-2.

without written consent.  Further, neither party served as the other's agent, nor were the officers or employees of one party deemed employees of the other.[21]

The Teaming Agreement was entered in the hopes that it would help DDC obtain 8(a) government contracting opportunities.  Beach understood the agreement as a notice, rather than a contract, whereby two companies "go steady" to see if they can develop business opportunities that would benefit both of them.  He believed that SAI benefitted from the agreement because Alaska Native corporations receive certain priorities with the SBA that are not offered to other 8(a) corporations.  SAI would reap the benefit of these priorities if it could work with DDC on 8(a) contracts.  Conversely, Beach understood that the teaming agreement would give DDC access to SAI's business opportunities and government contracts, as well as its data management services.

In spite of the perceived benefits, no work was ever obtained or performed under the Teaming Agreement.[22]

### 4.    The HCO loan to SAI.

Shortly after Beach started with DDC, he and Sobocienski exchanged numerous emails with Sylvain regarding a potential loan from DDC to SAI.  On October 5, 2011, Sobocienski forwarded Sylvain questions "from our Executive Management Team" about SAI's intended use of the borrowed funds, and whether it would be "possible/desirable for DDC to purchase a % of [SAI] as opposed to making a loan."[23]  Sylvain was also asked to identify any risks that would cause delay or result in the uncollectability of SAI's projected receivables, and explain how such risks could be mitigated.  Despite these concerns, the "gut response" by the Executive

---

[21] *Id.* at 2, ¶ II.B.2.

[22] *Stipulated Facts,* ECF No. 34, ¶ 8.

[23] Deft.'s Ex. H at D00029.

6

Management Team was that "this opportunity is a 'no brainer' based on the answers to the above questions."[24]

Sylvain emailed a response to Sobocienski the same day. He explained that he was the sole initial investor in SAI, which was an "S" corporation that he controlled 100%. The purpose of the loan was to generate "working capital" to cover the cost of new staff.[25] He further assured Sobocienski that the only risk to SAI's revenue was the discontinuance of existing government contracts, but explained even that would not impact the company's finances for the duration of the short term loan being sought.[26] Sylvain also responded that it would be possible to structure the transaction so DDC could purchase an interest in SAI rather than as a loan.

Beach testified that he was impressed with SAI, and by what Sylvain and his team could do managing the massive amounts of data belonging to various governmental entities. When questioned as to the basis for this impression, he testified that he had checked with the SBA regarding SAI's viability, and believed that the company had good contracts, good receivables, and a realistic expectation of acquiring good contracts in the future. He also learned that Sylvain had graduated from Harvard Business School and was a former Marine. Beach further testified that he had gone to Sylvain's office and seen his operation in action. He had a high opinion of Sylvain and SAI, and believed the business "would go crazy." He maintained that his inquiries with the SBA and his personal investigation of Sylvain and SAI satisfied any due diligence requirements for a prospective loan. However, he conceded that he never inquired as to the amount of SAI's existing debt, or the number of its other creditors, nor did he conduct a financial analysis of the company.

---

[24] *Id.*

[25] *Id.* at D00030. Sylvain wrote, "I have to hire new people, and increase my servers [sic] capacity. I have to bring 6 new employees to the US and supplement my external IT staff by 100% (from 3 to 6)."

[26] *Id.*

Sylvain sent another email to Sobocienski on October 18, 2011, with an attachment regarding "DDC Ownership Hybrid Proposal."[27]  He copied Beach with this email.  Beach responded on October 24, 2011 with a couple of questions.  He asked Sylvain to "help us with the use of funds for the $175,000 in your proposal," and requested a copy of SAI's operating agreement.[28]  Sylvain promptly replied, sending Beach a copy of SAI's bylaws and a projected profit and loss statement for SAI.[29]  This documentation reflects that SAI was seeking an investment of $350,000.  Of this sum, $175,000 would be applied to meet SAI's monthly payroll from October 30, 2011 through March 31, 2012.[30]

Sylvain also provided Beach a projected profit and loss statement for SAI.[31]  This portion of Defendant's Exhibit H so illegible as to be useless.  Nothing in Sylvain's correspondence detailed the pipeline of government contracts that SAI purportedly had.

On October 27, 2011, Beach emailed Sylvain with a follow-up question about SAI's "current cash flow and our participation."[32]  He wrote:

> We can certainly help with the next couple of months payroll [and] as we ramp our own cash flow we will be able to assist further.  Is it possible for us to work together after the first two months to meet your payroll with some of our cash flow and some of yours?  We will ultimately pay you the full amount for either 10% or 20% ownership in your company.  Our cash flow projections are such that we should be in a position to make your payroll in full without on our own [sic] by February 2012.[33]

---

[27] Deft.'s Ex. H at D00033.

[28] *Id.* at D00035.

[29] *Id.* at D00035-48.

[30] *Id.* at D00034.

[31] Deft.'s Ex. H at D00047-48.

[32] Pl.s' Ex. 8.

[33] *Id.*

8

Beach signed this email as the "EVP - Business Development" for Deloycheet's subsidiary, DDC. Sylvain replied the same day that he could "definitely work with you on this," and it would not be a problem to use both SAI's and DDC's cash flow to meet SAI payroll for the first two months.[34]

Although these email exchanges contemplated a transaction between DDC and SAI, it was Deloycheet's other subsidiary, HCO, who entered into the transaction with SAI. At HCO's October 28, 2011 board meeting, Beach presented a proposal whereby HCO would purchase shares in SAI for $100,000.[35] According to the minutes of this meeting, "[i]n order for the proposal to take place, HCO's $100,000 line of credit is to be used."[36] The minutes are silent on whether Beach presented any financial analysis or SAI's financial projections to the board. The proposal was unanimously approved by HCO's board. Promptly after the HCO board meeting, Sobocienski emailed Sylvain a copy of the minutes from that meeting. Sylvain responded with a proposed framework for HCO's acquisition of 20% ownership in SAI.[37]

---

[34] *Id.*

[35] Pl.'s Ex. 11 at D00050.

[36] *Id.*.

[37] Pl.'s Ex. 9 at D00052. Sylvain's email included a proposed acquisition plan for HCO to obtain a 20% ownership interest in SAI. The transaction was described as a "hybrid purchase" for "payroll support and cash injection." SAI's financial projections for 2012 reflected projected income of $1,793,838, projected expenses of $1,680,904, for total net income of $210,623. Projected cash flow as of December 2012 was $491,349. *Id.* at D00065. A table showing "Sylvain's Pipeline" listed seven government contracts with expiration dates at various times in 2012, but six of those contracts had renewal options for terms of between two and four years. The table reflected an overall contract value of $2,408,868, a "value" of $2,207,368, a monthly amount of $229,482, and "unfunded value" of $8,522,542. The "pipeline" amount for all contracts was $9,966,910. *See* Pl.'s Ex. 9 at D00066. There is nothing in the record to reflect that Beach, or HCO, had this information at the time the $100,000 transaction was presented to the HCO board on October 28, 2011.

Deloycheet held a regular meeting of its board of directors the following month, on November 16 and 18, 2011.[38]  Sobocienski was present.  The minutes from that meeting reflect that Sobocienski, in presenting her CEO report, projected that HCO and DDC projects would have positive cash flow by February 2012.[39]  Although reports for both subsidiaries were also given at this meting, the minutes do not mention HCO's transaction with SAI.  Deloycheet's accountant gave a less rosy financial report, and expressed his concerns "regarding outflow of cash and limited accounts receivable coming in."[40]  The board directed Sobocienski to present a budget and hold a  strategic planning session at the next Deloycheet board meeting sometime during the first quarter of 2012.[41]

By early December 2011, the HCO transaction still had not been firmed up, although the exact reason why is unclear.  On December 2, 2011, Sylvain sent an email regarding "CEO's Corner (Weekly Management Update)," which discussed the status of the "HCO Support/Investment in [SAI]."[42]  This email was addressed to three others at SAI, plus Sobocienski and Beach.  In it, Sylvain noted that the HCO deal might not come to fruition, but that he was continuing to work with Sobocienski to see how they could proceed.  He wrote, "It seems like we will go ahead and convert the investment into a loan instrument payable in full by November 2012.  As of right now I am not sure what the final number will be."[43]  Sylvain also wrote that he and Sobocienski would be meeting in D.C. the following week, on

---

[38] Pl.'s Ex. 18.

[39] *Id.* at D00090.

[40] *Id.* at D00087.

[41] *Id.* at D00092.

[42] Pl.'s Ex. 21.

[43] *Id.* at D00099.

10

December 7, to discuss "many open items," and he also anticipated providing support to Sobocienski "with her strategic plan."[44]

In January 2012, the proposal for HCO's involvement with SAI was changed by Sobocienski and Beach, with the approval of the HCO board, to a short-term loan in the amount of $100,000.[45]  The specifics of this loan are not in the record.

On January 23, 2012 Sylvain sent another email to SAI's management, under the subject line "CEO's Corner V," following up on the HCO transaction.  He wrote:

> [Sobocienski and Beach] from HCO were in DC and the news is that HCO will not be seeking ownership in [SAI].  Even though we had anticipated for this purchase to take place, we have adjusted our financial plan and remove [sic] all funds anticipated from HCO.  The funds that we had received for payroll support will be paid off by June 30th, 2012.[46]

There is no evidence that a loan agreement or promissory note was ever executed, or that any of the terms of the HCO loan were ever reduced to writing.  Nonetheless, between October 30, 2011, and February 2, 2012, HCO made four wire transfers totaling $100,000 to Sylvain Analytics, from its line of credit with Wells Fargo.[47]

### 5.   Beach and Sobocienski Change Their Status with Deloycheet, and Tighten Their Ties with SAI.

### A.   The Professional Management Agreements.

Beach testified that he became frustrated with the Deloycheet board.  He said he was given a lot of latitude in his job, but that it took a while to present new ideas to or have decisions made by the board.  He also came to the conclusion, based on the board's financial concerns, that

---

[44] *Id.* at D00100.

[45] *Stipulated Facts*, ECF No. 34, ¶ 10.

[46] Pl.'s Ex. 32.  There is no indication that this email went to Beach or Sobocienski; Beach testified that he did not recall receiving it.

[47] *Stipulated Facts*, ECF No. 34, ¶ 11.

it was unlikely that he would receive a performance bonus in the near future.  In response to these concerns, both he and Sobocienski contemplated changing their working relationship with Deloycheet from employees to independent contractors.  Beach rationalized that this would save Deloycheet money, while allowing him to supplement his income from other sources if he worked as an independent contractor.

Beach and Sobocienski entered Professional Management Agreements with Deloycheet effective January 15, 2012.[48]  Sobocienski, with input from Beach, drafted these agreements.[49]  The agreements were signed by Eugene Paul, Deloycheet's president, on February 15, 2012.[50]  No evidence of any negotiations was presented at trial.  Under these documents, Beach and Sobocienski were now engaged as "professional managers" who offered "expertise and knowledge related to day to day management and new business development," and agreed to provide such services to Deloycheet and its subsidiaries.[51]  The agreements were for a term of one year, unless terminated earlier.

The agreements specified that Beach and Sobocienski, in their capacities as professional managers, were not employees of Deloycheet but were instead providing services as independent contractors.  Yet, the agreements did not alter the amount of annual compensation to be paid to either of them; Beach was still to receive his annual base compensation of $120,000, and Sobocienski's annual base compensation remained $130,000.[52]  The agreements also contained provisions for annual incentive bonuses, and entitled Beach and Sobocienski to an office, clerical

---

[48] Pl.'s Exs. 41, 42.

[49] *Stipulated Facts*, ECF No. 34, ¶ 12.

[50] *Id.* at ¶ 13; *see also* Pl.'s Ex. 43.

[51] Pl.'s Ex. 43 at D00116.

[52] Pl.'s Ex. 41 at D00116-117; Pl.'s Ex. 42 at D00110-111.

support, and a computer, as well as use of a company credit card or personal reimbursement for authorized expenses.

The Professional Management Agreements could be terminated without cause by either party, in which event Beach and Sobocienski would be entitled to six months of severance pay at the compensation rate in effect at the time of termination.[53]  This was a significant deviation from Beach's earlier employment contract, under which he was not entitled to severance pay if he voluntarily terminated his relationship with Deloycheet.  However, there was no entitlement to severance pay under the Professional Management Agreements if Beach or Sobocienski were terminated for cause.

## B.    Deloycheet's February 2012 Board Meeting.

At a board meeting held February 25, 2012, Deloycheet's president, Eugene Paul, gave a report regarding the new Professional Management Agreements for Beach and Sobocienski.[54] Aloysius, another member of the Deloycheet board, questioned Paul's authority to enter these agreements without board approval, and indicated she was not comfortable approving his report. Notwithstanding these concerns, the board ratified Paul's acceptance of the new agreements with Sobocienski and Beach by a 4-3 vote.[55]  These agreements made Sobocienski and Beach independent contractors, rather than employees, of *Deloycheet*,[56] but Aloysius testified that the board expected them to continue providing the same services as before their change in status.

---

[53] Pl.'s Ex. 41 at D00117-118; Pl.'s Ex. 42 at D00111-112.

[54] Pl.'s Ex. 45 at D00171.  The minutes state that Paul gave a verbal report that he worked with Sobocienski and an attorney "to draft up two contracts for two employees."  *Id.*  However, during his deposition, Paul testified that he had reviewed and signed the two agreements, but had not discussed them with anybody.  *See* Suppl. to Deloycheet's Depo. Designations, ECF No. 38 at 4-5 (Excerpt of Depo. of E. Paul, 67:13-15; 70:5-13).

[55] *Stipulated Facts*, ECF No. 34, ¶ 14.

[56] *Id.*  Beach's former employment contract had been with DDC.  Sobocienski's initial employment contract is not in the record.

Beach gave a report regarding DDC's ongoing projects in Minot, North Dakota. Per the minutes, the primary business for DDC in that location was flood restoration. Electrical services were also provided. Beach advised that "[w]ork is flowing in," and projected that 2012 would be a "benchmark year for revenue."[57] Beach testified regarding these projects at trial. The first project, for disaster response, was started in August 2011 shortly after he was first hired by DDC. Thousands of homes in Minot had been damaged by floods, and there was a huge need for flood restoration services. Beach said he also discovered, once a crew was established in Minot, that several of the damaged homes needed to be rewired for electricity. The need for electricians was not being met, and some of the DDC employees in Minot also had experience in this trade. Beach said a second project was started in Minot to provide electrical services.

Although Beach presented a positive outlook for DDC's projects, the overall financial report presented at Deloycheet's February 2012 meeting was much less optimistic. The accountants stated that Deloycheet was rapidly losing equity, and had never been in so much debt. The minutes note that one of the accountants told the board: "the more revenue Deloycheet produces the more money it loses."[58] HCO was the only subsidiary making money, and the board was advised that DDC's projects might have to be shut down if the situation did not change.

The next item discussed was a financial report for HCO. During this portion of the meeting, board member Aloysius asked about the $100,000 loan to SAI. At trial, she testified that the HCO loan had never before been presented to the full Deloycheet board; she had first learned of it in one of the weekly reports she received from Sobocienski and Beach earlier in February. Aloysius noted that Deloycheet itself was in a cash flow crisis, and not in a position to give out loans. She said she was appalled that a loan had been extended to a company that

---

[57] Pl.'s Ex. 45 at D00172-173.

[58] *Id.* at D00173.

14

could not meet its own payroll. She asserted that the transaction had not followed the proper procedure for approval; it should have been put on Deloycheet's meeting agenda, with information about the transaction sent out beforehand in the meeting packet so that the board would have time to review it. She believed Deloycheet's board was the one that should have voted on the transaction. At the February 2012 board meeting, the Deloycheet board voted to accept HCO's financial report, excluding the HCO loan question.[59]

### C. Beach and Sobocienski Form Alaska Native Enterprise Developers, Inc., and Turn Their Efforts to SAI.

In the midst of Deloycheet's scrutiny of the HCO loan to SAI, and contemporaneously with the negotiation of their new Professional Management Agreements, Beach and Sobocienski approached Sylvain with the idea of working individually with SAI. On February 1, 2012, more than three weeks before the Professional Management Agreements were ratified by the Deloycheet board, Beach wrote an email to Sylvain, with a copy to Sobocienski, in which he stated:

> [Sobocienski] and I are excited about moving forward with you to launch [SAI] to a higher level. You have done an amazing job building the company this far. [Sobocienski] and I believe that by engaging us we can marry [SAI] to the right ANC, bring an investor with $500,000 to $2 million, and bring additional clients. As part of the ANC relationship we can help to build out the development of that business. I have had several conversations with my investment banker contacts in NYC . . . about what is happening at SAI. [One] has current software holdings and he has affirmed my belief that a public offering may in fact be the most lucrative exit strategy for [SAI].[60]

---

[59] Pl.'s Ex. 45 at D0074.

[60] Pl.'s Ex. 36. Beach sent this email from his DDC email account.

In closing, Beach said he looked forward to their upcoming meeting in Orlando "as well as the large potential that we have together."[61] Sylvain responded that Beach's email sounded "great," but he would need a lot of help.[62]

The day after Beach sent this email, he and Sobocienski signed Articles of Organization as the organizers of a new limited liability company, Alaska Native Enterprise Developers, LLC ("ANED").[63] Shortly afterwards, ANED presented a proposal to SAI entitled "The Next Level."[64] The proposal described ANED as a firm created and owned by Beach and Sobocienski with the goal "to connect businesses with opportunities while honoring culture."[65] SAI was described as being successful in winning government contracts, but having "several critical issues that need immediate assistance," including cash flow, management, and the need to partner with an "Alaska Native Corporation 8(a) . . . through a Joint-Venture Agreement to move to the next level of federal contracting to maximize [Sylvain's] business as well as bring a small ANC 8(a) into a business line they may not have had the entry into on their own."[66] ANED proposed to solve these issues by finding an investor to infuse $500,000 into SAI. ANED further proposed to create a joint venture between it and "the identified ANC 8(a)," with Sobocienski serving as business executive and Beach as the marketing executive. Under the time line set out in the proposal, ANED would manage the joint venture business starting on April 15, 2012, and

---

[61] *Id.*

[62] *Id.*

[63] Pl.'s Ex. 40. This document was received by the Alaska Division of Corporations two months later, on April 24, 2102.

[64] Pl.'s Ex. 38. The proposal states that it was presented on February 7, 2012.

[65] *Id.* at D00149.

[66] *Id.* at D00150.

receive $20,000 per month, to be shared equally between Beach and Sobocienski.[67]   It was ultimately contemplated that ANED would acquire a 4% ownership interest in SAI.

Beach testified that "The Next Level" was simply a proposal, or opportunity, that he believed he and Sobocienski could present to SAI based on their anticipated independent contractor status.   He understood the Professional Management Agreements gave them the chance to work simultaneously for other businesses.   When he was asked if his intent was to receive $10,000 monthly from both SAI under the ANED joint venture, and Deloycheet as an independent contractor, so that he would suddenly double his income and make $240,000 per year, Beach responded that he hadn't actually thought about this detail.   He testified that he didn't think his plan was to do both jobs at the same time.   Rather, if he got the opportunity to work with Sylvain, he intended to take it.   He told no one but Sobocienski about the proposal with SAI.   He also testified that he hoped to somehow involve HCO in the joint venture with SAI, although "The Next Level" proposal says nothing about HCO, DDC or Deloycheet.   Beach explained that there was always "the assumption" that the plans with SAI would ultimately benefit Deloycheet as well.

On February 27, 2012, two days after the Deloycheet board meeting, Sylvain forwarded a draft management agreement by email to Sobocienski at her DDC email address and to Beach at one of his personal email addresses.[68]   The draft agreement stated that SAI would engage ANED "to provide business development advisory services by providing expertise in the operation of the Business and such management services as may, from time to time, be requested by the Company."[69]   ANED would receive $240,000 annually, and would also acquire a 2% ownership interest in SAI at the conclusion of both the first and second years of the contract, for

---

[67] Pl.'s Ex. 38 at D00151.

[68] Pl.'s Ex. 46 at D00181.

[69] *Id.* at D00182.

17

a total ownership interest of 4%.  The term of the agreement was two years, and during such term, ANED was to "devote [its] best efforts to [its] duties as a Manager of [SAI]."[70]

Sobocienski responded to this email the following day.  She wrote that she would get back to Sylvain over the weekend, and asked him to use her personal email addresses in the future.[71]  On March 4, 2012, she sent a further email to Sylvain, with a copy to Beach, with a red-line version of the draft management agreement between SAI and ANED.[72]  She also wrote, "I left [Beach] a message today about the need for the investor to be signed up this week and that the $1 million cash investment is appropriate at this time since you have had some substantial opportunities develop since we last spoke."[73]  She indicated she would also be doing some work to further SAI's interests.

On March 22, 2016, Sobocienski sent an email to Beach, marked high priority, which included a revised management agreement with SAI.[74]  Sobocienski wrote that, once Beach gave her "the go ahead," she would print three copies of the agreement, sign them, and deliver them to him so he could "close out with [Sylvain]."[75]  The essential terms of the revised management agreement matched the initial draft Sylvain had sent earlier; ANED was to receive $240,000 annually, and could acquire up to a 4% ownership interest in SAI.

The following day, Beach sent an email to Sylvain regarding a "couple of things I forgot."[76]  He noted that the active date of the management agreement with SAI had not yet been

---

[70] *Id.* at D00183, ¶ 1.4.

[71] *Id.* at D00181.

[72] Pl.'s Ex. 47 at TS284.

[73] *Id.*

[74] Pl.'s Ex. 53 at CB0729.

[75] *Id.*

[76] Pl.'s Ex. 55.

filled in.  He also asked if it was possible for him and Sobocienski to be covered under SAI's health insurance.  He requested that Sylvain email him the dates for two upcoming trade shows, so he could "get them plugged into [his] calendar ASAP."[77]  He asked if the 4% ownership interest to ANED would still vest if SAI were to execute an exit strategy or buy out before the two year term of the management agreements, and advised that a potential investor "called again today" and was "extremely impressed" with SAI.[78]

Sobocienski's March 22 email to Beach indicated that she was ready to sign the revised management agreements.  Beach testified that he couldn't recall signing these documents, however.  He said he may have, but didn't remember, though in earlier deposition testimony he denied signing the management agreements.

### D. Beach's Efforts to Find an Investor for SAI.

While discussing the exact parameters of his new relationship with ANED and SAI, Beach was soliciting investors for SAI.  On March 14, 2012, he contacted one company, Seneca, regarding a "software opportunity" with SAI.[79]  Five days later, he sent an email to Sylvain from an email address at ANED, with the subject line "Update," which states, "[W]hile I have a high level of confidence that we are on the right track with the Dr. and his group, I am also continuing to put [SAI] in front of several other capable and interested investors."[80]  He told Sylvain that he should focus on what he does best "and know that [Sobocienski and I] are not resting until we have the capital that [SAI] needs."[81]

---

[77] *Id.* at CB0736.

[78] *Id.*

[79] Pl.'s Ex. 49.  Beach used his DDC email account to make this contact.

[80] Pl.'s Ex. 50.

[81] *Id.*

Beach testified he was now trying to find a $1.5 million investor for SAI.  SAI would in turn use $240,000 of the funds to pay ANED.  Beach said Seneca was a Native company in the Lower 48 that had an interest in SAI, and he had tried to get HCO involved "as a tag along to that opportunity."  Beach also approached a doctor as a potential investor.  He and Sobocienski met the doctor in Atlanta to give a presentation regarding SAI.  Beach could not recall the exact date of the meeting, though an email from Sylvain to the doctor, dated April 27, 2012, references an upcoming meeting the following Monday, April 30.[82]  Beach was copied with this email at his ANED email address.  A document presenting an overview of SAI was attached to this email.  One page of this presentation shows SAI's projected use of $1,536,376 in investor funds, including a line item for "Business Development Team (2) - $240,000."[83]  The overview also included projected income statements, and projected balance sheets, for "base," "best," and "worst" case scenarios running from 2012 through 2016.  The projected income statement for 2012 reflected that, under the worst case scenario, SAI would have net income of just $22,076.[84]

Beach was asked if his travel expenses at this time were paid by HCO or SAI.  He responded that he couldn't recall specifically, but that during his trips, he would also present opportunities on behalf of HCO.  For this reason, he said HCO may have paid his travel expenses.

Sometime in April 2012, a draft joint venture plan between SAI and an unidentified 8(a) Alaska Native corporation was prepared.[85]  It listed several advantages that SAI would acquire through a joint venture with an Alaska Native corporation ("ANC"), including the ANC's exemption from competitive threshold limits and its ability to receive "total contract awards

---

[82] Pl.'s Ex. 58.

[83] *Id.* at TS 327.

[84] *Id.* at TS 333.

[85] Pl.'s Ex. 22.

greater than $100MM."[86]  Neither HCO, DDC, nor Deloycheet are mentioned in this draft plan. Still, Beach believed that the Teaming Agreement between DDC and SAI created an "assumption" that DDC, HCO and Deloycheet would benefit from this proposed joint venture. He acknowledged, however, that HCO was too small of a Native corporation to participate alone in the planned venture.  According to Beach, HCO, who holds an 8(a) certification, could "tag along" with whichever other Alaska Native corporation might become part of the joint venture.

### 6. Late April to Early May 2012 - Beach Pitches a Spray Foam Transaction to DDC.

In addition to his efforts to procure an investor for SAI during April 2012, Beach was also preparing a proposal for DDC to purchase a spray foam business in Minot, North Dakota.  He emailed Sobocienski about the proposal on April 25, 2012, together with an attached "Proposal Review Template and Checklist."[87]  The Checklist stated that "the opportunity at hand is to acquire a new startup spray foam company," including the necessary equipment, an existing website, marketing materials, "and one key person to promote, train and drive the business growth."[88]  To acquire this business, Beach advised that DDC would be required to enter "a one year contract with the key supervisor at $1,000 per week."[89]  The cost of this supervisor was included in Beach's calculations of projected business growth, which showed that, even under a conservative model, the spray foam business would yield a profit for DDC within one year.

Beach's email to Sobocienski stated that "the deal is pretty strong but has to be executed pretty quickly, by May 7th."[90]  Sobocienski took action to convene a meeting of DDC's board

---

[86] *Id.* at 3.

[87] *See* Pl.'s Ex. 70.

[88] *Id.* at D00801.

[89] *Id.* at D00802.

[90] *Id.* at D00799.

so that the proposal could be considered expeditiously.[91]   The DDC board meeting was held on May 8, 2012.[92]  Beach and Sobocienski were present.  Beach presented the spray foam proposal as an opportunity to expand DDC's existing business in Minot.  He also represented to the board that an experienced spray foam technician would be employed by the business.  The cost of the business opportunity was $57,500, which would include "all brand-new equipment (including) a trailer-mounted spray foam tank, a high capacity air compressor and a generator."[93]   Beach represented that the demand for this business was "huge" in Minot, because there were more than 4,000 homes in that town that had to be gutted and rebuilt.[94]  He assured the DDC board that there was a good chance of making a profit from the business.

The DDC board approved the spray foam proposal at the May 8, 2012 meeting.  As of this date, however, Beach had already signed a Purchase and Sale of Business Agreement, dated May 1, 2012, on behalf of DDC, to buy North Dakota Spray Foam ("NDSF").[95]  The agreement listed NDSF's business address as 1208 Mississippi Street in Lawrence, Kansas, the residential address for his son, Corey Beach ("Corey").  Further, Corey was to be the key supervisor of DDC's new spray foam business, though Beach did not disclose this fact to either Sobocienski or the DDC board.

The spray foam agreement stated that the assets being sold to DDC included equipment, goodwill, and multiple URLs and websites.[96]  It also represented that the seller, NDSF, was duly incorporated, validly existing, in good standing, and that it was the absolute, beneficial owner

---

[91] Pl.'s Ex. 70 at D00799.

[92] Pl.'s Ex. 72.

[93] *Id.* at D00804.

[94] *Id.* at D00805.

[95] Pl.'s Ex. 77, at D00860.

[96] *Id.* at D00848.

of the assets being sold.[97]  In reality, the equipment for the business was purchased from another entity, Spray Foam Equipment & Manufacturing, using funds that had been earmarked for the sale transaction with NDSF.[98]  Beach arranged for the sum of $38,850 to be wired to the bank account of Spray Foam Equipment & Manufacturing on May 11, 2012.[99]  Beach's name was listed as purchaser of the equipment on the invoice from Spray Foam Equipment & Manufacturing.[100]  He confirmed at trial that the equipment for DDC's new spray foam business did not belong to NDSF.  However, NDSF did receive $14,900 from the sale transaction.[101]

### 7.   Beach and Sobocienski Resign from Deloycheet, and Beach Arranges the $400,000 Loan.

#### A.   Resignation Letter.

In May 2012, Sobocienski mailed a letter of resignation to Deloycheet, on behalf of herself and Beach.[102]  Sobocienski signed the letter on behalf of Beach, with his consent.  The letter was dated May 15, 2012, and was addressed to Deloycheet's president, Eugene Paul, at a post office box address in Anchorage.  Both Beach and Sobocienski knew that Paul resided in Holy Cross.  Yet, there is no evidence that a copy was emailed to Mr. Paul, or to any other board member.

The letter gave notice that Sobocienski's and Beach's "formal resignation" was effective May 25, 2012.[103]  It also gave notice that they were "executing the severance clause and the

---

[97] *Id.* at D00850-51, ¶¶ 10.b, 10.d.

[98] Pl.'s Ex. 73.

[99] *Id.* at D00806-807.

[100] *Id.* at D00809.

[101] Pl.'s Ex. 74 at D00811-12.

[102] Pl.'s Ex. 63.

[103] *Id.* at D00191.

termination clause of our professional management agreements," and asked that their severance checks be issued and made available to them on May 25th.[104]

Aloysius testified that this letter was not received by Deloycheet until after its effective date of May 25th.  She also stated that it had been simply tucked in a file on receipt, so the board was not aware of it immediately.

Beach testified that he and Sobocienski had previously discussed their "exit strategy" from Deloycheet with Paul.  He said there was an understanding that they would continue to be available to Deloycheet on an hourly basis after they resigned.  When asked whether this plan had been written down anywhere, he said a time line and transition plan had been submitted, and was somewhere in the board minutes.  He maintained the plan was "certainly common knowledge" at Deloycheet.  No other testimony or documentary evidence supports these contentions, however.

### B.    The Transaction at Issue - a $400,000 Loan from Deloycheet to SAI.

After the letter of resignation had been sent, but before the May 25 effective date, Beach had a telephone conversation with Deloycheet's president, Eugene Paul.  Beach believes that the conversation occurred on May 18, 2012.  The parties have stipulated that the purpose of the call was to recommend that Deloycheet make a $400,000 short term loan to SAI.[105]  However, Sobocienski indicated in a subsequent email to Sylvain that Beach had called Paul about other matters, and had brought up the loan "on a side note."[106]  The term of the loan was to be six

---

[104] *Id.*

[105] *Stipulated Facts*, ECF No. 34, ¶ 15.

[106] Pl.'s Ex. 66 at CB0547.

months with an $80,000 loan fee.[107]  Neither Beach nor Sobocienski told any other Deloycheet board member about the proposed loan to SAI.[108]

During the phone conversation, Beach did not tell Paul about his involvement with Sylvain, or ANED's proposed joint venture with SAI.  Beach did not mention that he and Sobocienski had submitted a letter of resignation.  Nor did he bring up the fact that the HCO loan to SAI was still outstanding.  Further, he did not tell Paul that he had been trying to find a much larger investor for SAI, without success, for a couple of months, or that the $400,000 loan from Deloycheet would be used for SAI's payroll.[109]  Beach could not remember where the $400,000 figure had come from, or why SAI was willing to pay a 20% loan fee for a six month loan.  He did not discuss any security or how SAI would be able to repay the loan.  There is no evidence that Beach provided Paul with any financial analysis during the conversation.

At trial, there was conflicting testimony about the content of Beach's telephone conversation with Paul.  Beach said Paul approved the loan during the telephone conversation.  He claimed Paul said approval of the deal sounded like "a no brainer," and was very excited about the prospect.  Beach also testified that he did not think he had to get board approval for this transaction.  Rather, he believed Paul had direct authority to approve a transaction up to $400,000.  He claimed to have seen an organizational chart at Deloycheet that indicated this, but no chart was introduced at trial.  He also contended that minutes from a subsequent Deloycheet board meeting confirmed that Paul had approved the loan.  Beach was give a week, post-trial, to supplement the record with this documentary evidence, but nothing has been introduced into the record.

---

[107] *Stipulated Facts*, ECF No. 34, ¶ 15.

[108] *Id.*, ¶ 16.

[109] On this point, Beach said he didn't tell Paul that the loan would be used for payroll "because that wasn't necessarily the case."  Yet, he conceded that HCO's loan had been used on "job specific payrolls" for SAI.  Further, in subsequent emails to Wells Fargo regarding the $400,000 loan, Beach mentioned that the borrowed funds would be used for SAI's payroll.

Paul remembered having a telephone conversation with Beach about the loan, but he was adamant that he did not approve it.[110]  He also testified that he did not tell Beach the loan was "a no brainer."[111]  He further stated that the loan had to be presented to the Deloycheet board for approval, and that he didn't have authority to approve the transaction over the telephone.[112]

After the phone conversation with Paul, Beach drafted a loan agreement for the $400,000 transaction,[113] and emailed it to Sylvain from his ANED email address on Saturday, May 19, 2012.[114]  Sylvain signed the agreement on Sunday, May 20, 2012, and emailed it back to Beach, at his ANED email address, with a brief message, "Please find attached the signed loan agreement.  Let's roll!"[115]

Sobocienski was copied with both emails, at her DDC email address.  After Sylvain returned the signed loan agreement, she replied the same day by email to both him and Beach:

> Ray.  Thanks to [Beach] BIG TIME on this one.  He called our board President about other issues and on a side note brought this opportunity up.  I was so thankful he had the conversation.  I will sign it and work with our bankers to transfer funds.  Let me know your preference to transfer.[116]

Sylvain responded:

> [Beach] is truly the rain maker!!! . . . we just got done with the financials and we are looking great.  We will turn right back and transfer $100K that we received with the 10% interest.  Now, we

---

[110] *See* Ex. C to Deloycheet's Depo. Designations, ECF No. 33-3 at 10 (Depo. of E. Paul, 127: - 128:6; 131:16-132:6).

[111] *Id.* (Depo. of E. Paul, 132:7-13).

[112] *Id.* at 10-11 (Depo. of E. Paul, 130:2-131:11; 144:11-146:25).

[113] *Stipulated Facts*, ECF No. 34, ¶ 17.  Beach testified that he "pulled" a sample loan agreement off line, and edited it before sending it to Sylvain.

[114] Pl.'s Ex. 67; *see also* Pl.'s Ex. 66 at 2.

[115] Pl.'s Ex. 67 at CB0365.

[116] Pl's Ex. 66 at CB0547.

> have three months to really pick and choose what group of
> investors do we need to bring on.[117]

The $100,000 referenced in this email was the earlier HCO loan, which SAI was going to repay with the newly borrowed funds. SAI did repay the $100,000 in June 2012, but without interest.[118]

Sobocienski did not sign the loan agreement on behalf of Deloycheet. On Monday, May 21, at 11:38 a.m., Beach forwarded Sylvain's "Let's roll" email to Paul, with the attached loan agreement.[119] He sent a copy of this email to his DDC email address, but did not copy Sobocienski. His email reiterated the loan terms – "$400,000 with a 6 month term and $80,000 is the amount that [Deloycheet] will profit at that time" – and asked Paul to sign the loan agreement and send it back to him by email or fax.[120]

Less than an hour after Beach's email to Paul, at 12:24 p.m., Sobicienski sent an email from her DDC email address to a bank representative at Wells Fargo, to arrange a wire transfer of $400,000 from Deloycheet's general account to SAI's bank account.[121] She copied Paul and Beach with this email. In the email, she wrote, "Please find the attached letter to transfer funds per our Board President, Eugene Paul."[122] She signed this email as the CEO of Deloycheet, despite her tendered resignation. The letter attached to her email was on Deloycheet letterhead. It asked that a wire transfer of $400,000 be processed from Deloycheet's general account and

---

[117] *Id.*

[118] *Stipulated Facts*, ECF 34, ¶ 11.

[119] Pl.'s Ex. 67.

[120] *Id.* at CB0365

[121] Pl.'s Ex. 68; *see also Stipulated Facts*, ECF No. 34, ¶ 20 ("On Monday, May 21, 2012, Sobocienski sent a letter to Wells Fargo bank asking that the $400,000 be transferred to [SAI].").

[122] Pl.'s Ex. 68 at D00200.

provided the details for SAI's bank account at Navy Federal Credit Union.[123]  The letter was signed by Sobocienski, rather than Paul, and made no representations regarding Paul's authorization or approval for the transfer.

Just over an hour later, Beach sent an email from his DDC email address to Christopher Clifford, another bank representative at Wells Fargo.[124]  He wrote that he and Sobocienski "negotiated a loan from DI to [SAI].  [SAI] has secured $3.2M in federal contracts for 2012 with another $2.2M probable before years end."[125]  He summarized the essential loan terms: "$400,000 for 6 months and the total payback is $480,000 in November 2012," and advised that the funds would be used "for additional payroll for completion of new awards, upgrades to secure servers and eliminating a small amount of debt."[126]  He also wrote that he believed the funds had been transferred that day from Deloycheet's general account, and that Sobocienski would be contacting Wells Fargo to move funds from Deloycheet's investment account to replace the funds loaned to SAI from the general account.

When the May 21 emails to Wells Fargo were sent, neither Beach nor Sobocienski had received a signed copy of the loan agreement, or any other response, from Paul.  In fact, the loan agreement was never signed by any representative of Deloycheet.[127]

---

[123] *Id.* at D00201.

[124] Pl.'s Ex. 69 at 3.

[125] *Id.*  The $3.2 million figure matches the number shown on the SAI overview that had been prepared to present to the potential doctor investor in late April 2012.  *See* Pl.s Ex. 58 at TS 328.  While the overview did show that nine government contracts had been awarded, with a value of $3.2 million, two of these contracts were to end in September 2012, one had a start date of June 1, 2012, and two didn't start until October 1, 2012.  All the other contracts were listed as being "in R&D" or "pending," and almost all of them had start dates of October 1, 2012 or later.  *Id.*  There is nothing in the record to show that the SAI overview was shared with Paul, or anyone else at Deloycheet.

[126] Pl.'s Ex. 69 at 3.

[127] *Stipulated Facts*, ECF No. 34, ¶ 19.

On Tuesday, May 22, 2012, Mr. Clifford responded to Beach's email.  He copied Sobocienski and Joellen Weatherholt, another Wells Fargo representative.  Clifford expressed several concerns about the transfer that Beach had requested, one being that the loan described by Beach, for payroll, "reads like a venture capital loan.  This type of lending is high risk."[128] He was also concerned that the transfer from Deloycheet's investment fund would place the corporation at risk, unable to meet its own financial obligations.

The following day, in response to Clifford's email, Weatherholdt sent an email to Sobocienski and Paul, with copies to Beach and Clifford.[129]  She voiced the same concerns Clifford had expressed, again characterizing the SAI loan as a high-risk investment.  She also wrote, "I CAN NOT send your cash to the checking account without speaking to one of the signers in person or by phone for authorization to transfer the money."[130]  She noted that the current authorized signers on the account included Paul and Sobocienski, "as CEO," and asked that one of them call her to authorize the distribution, reiterating that she could not accomplish the transfer until this had occurred.

On Friday, May 25, 2012, Sobocienski forwarded the email chain between Beach, Clifford, and Weatherholdt to Aloysius, without message.[131]  May 25th was the effective date of Sobocienski's and Beach's resignation, and also the Friday before the long, Memorial Day weekend.

Also on May 25th, Beach sent an email to Sylvain, from his ANED email address, asking Sylvain to send the first $20,000 payment to ANED.  He wrote, "Based on the time [Sobocienski] and I have worked directly in [SAI] initiatives in April and May, the contract with

---

[128] Pl.'s Ex. 69 at 2.

[129] *Id.* at 1.

[130] *Id.* (emphasis in original).

[131] *Id.*

29

ANED, LLC should begin May 1st."[132]  Sylvain responded to the payment request by writing, "deservedly so.  No problem with me on that one.  You guys have done a lot for me."[133]  He indicated that the check would be mailed the next day, a Saturday, but noted delivery would be delayed due to the holiday weekend.

On May 30, 2012, Beach sent an email to SAI staff clarifying that the "May retainer" should instead be sent electronically to Sobociencki's personal bank account.[134]  He also requested that "the June check" be made payable to ANED and mailed as soon as possible.

On the morning of Wednesday, May 31, 2012, Aloysius emailed Clifford at Wells Fargo to find out if the $400,000 transfer to SAI had actually occurred.[135]  She referenced Clifford's May 22 email to Beach that questioned the $400,000 wire transfer from Deloycheet's investment account.  She said, "It is not clear to the President or the Board of Directors if this went out or not," and asked him to research this.[136]  Aloysius testified that there was a lot of confusion at Deloycheet at this time.  Clifford, after asking for further details from Aloysius as to when the transfer may have occurred, responded on June 4, 2012 that a wire transfer of $400,000 to SAI from Deloycheet's general account had in fact occurred on May 21st.[137]

   8.    **Fallout.**

      A.    **Deloycheet's General Account is Overdrawn.**

Deloycheet's largest source of annual income, the 7(j) funds from HCO, is received annually in May.  The amount of 7(j) funds Deloycheet received in May 2012 is not in the

---

[132] Pl.'s Ex. 71 at CB0825.

[133] *Id.*

[134] Pl.'s Ex. 79.

[135] Pl.'s Ex. 83 at D00206-07.

[136] *Id.* at D00205; *see also Stipulated Facts*, ECF No. 34, ¶ 20.

[137] *Id.* at D00205.

record.  However, Aloysius testified that at the time of the loan transaction, there was just $700,000 in Deloycheet's general account.  The $400,000 transfer from that account to SAI left Deloycheet with insufficient funds to cover its own obligations.  To cover the deficit, Beach and Sobocienski took action to transfer funds from Deloycheet's investment account to the general account, before the effective date of their resignation.[138]  As noted above, their emails to Wells Fargo resulted in concerned responses from Deloycheet's bank representatives at Wells Fargo about the SAI loan not only being high risk, but potentially leaving Deloycheet unable to fund its own projects.[139]  After the funds were transferred to SAI, Deloycheet's general account became overdrawn on more than on occasion.[140]

### B.    Spray Foam Transaction.

DDC's spray foam business fell apart immediately after Beach left Deloycheet.  As discussed above, the spray foam deal approved by the DDC board contemplated payments of $1,000 per week to NDSF's "key supervisor," or a total of $52,000 annually.  The key supervisor was Beach's son, Corey, who was 20 years old at the time DDC approved the transaction.  Beach failed to disclose this fact to either Deloycheet or Sobocienski.[141]  Despite Beach's assurances that the supervisor was experienced in the spray foam business, his son had only received training in this area.  Corey had never actually worked in, let alone run, such a business.  In fact, Corey sought his father's assistance in preparing quotes for the spray foam business.[142]

After the spray foam equipment was purchased in mid-May, NDSF started to send weekly invoices to DDC for $1,000 for "spray foam consulting" services.  On May 30, 2012, DDC made

---

[138] *See* Pl.'s Ex. 69.

[139] *Id.*

[140] *Id.*

[141] Beach testified that he thought he had told Sobocienski about this, but Sobocienski stated that she did not know about Corey's involvement until after Deloycheet filed its state court civil action.

[142] *See* Pl.'s Ex. 75.

its first payment of $1,000 to NDSF.[143]  A second check for $2,000 was issued to NDSF on June 12, 2012, to pay for "spray foam consulting" services for the weeks ending 6/2/12 and 6/9/12.[144] The $2,000 check was endorsed for deposit by Corey.  Another invoice for consulting services was sent for the week ending June 23, 2012,[145] but was not paid.

After Beach left Deloycheet, the spray foam business was shut down.  Between June 5 and June 24, 2012, copies of various receipts were emailed to Beach's DDC email address from Super Cheap Signs, for orders of business cards, yard signs, and other items related to NDSF, a company that supposedly was already in business when DDC purchased it.[146]  Aloysius testified that Deloycheet's counsel investigated whether NDSF was a bona fide corporation and concluded that the corporation did not exist.  She further testified that DDC attempted to liquidate the spray foam equipment, which was supposed to have been new.  It was not.  Once, Deloycheet recovered the equipment, it appraised for roughly $15,000, but could not be sold.

The contract between DDC and NDSF, which Beach said he had signed in May, was not in Deloycheet's records.  Deloycheet first saw the contract when an attorney retained by Corey included a copy of it with a demand letter sent to Deloycheet's attorney, seeking to enforce the weekly payment provisions.[147]

### C.    Sylvain Breaks Ties with Beach and Sobocienski.

Sylvain paid $40,000 to Beach and Sobocienski between May and June 2012.  In early June 2012, Sylvain was still desperate for an investor, and the amount sought had increased to

---

[143] Pl.'s Ex. 74 at D00821.

[144] *Id.* at D00814, D00816, D00822.

[145] *Id.* at D00817.

[146] Pl.'s Ex. 76.

[147] Pl.'s Ex. 77.  Aloysius testified that no one at Deloycheet knew that Beach's son Corey was the person running the spray foam business, or had even seen the contract, until the collection letter was received.

$1.8 million.[148]  The urgency of the investment was acknowledged by Sobocienski in an email she sent to Sylvain and Beach on June 10, 2012; "We also know that [Sylvain] also needs this investment to happen by a very quick deadline.  What is the drop dead date?"[149]

Beach and Sobocienski did not succeed in finding an investor for SAI.  On June 28, 2012, when Sobocienski emailed Sylvain a second invoice for $20,000, Sylvain declined to make the payment.  He responded that he was not comfortable with how things were going, and that they had not yet come to an agreement "on this."[150]  He complained that he was in an even deeper hole than he was two months ago, and that ANED had failed to deliver a proposal that was due "yesterday."  He also wrote, "Now, I have Deloycheet on my back demanding their $400K back.  Money I thought was a loan to my company at a super high interest rate that I agreed to pay.  We came from 'I have investors line [sic] up' to borrowing money from Deloycheet that is now questionable."[151]

### D.    SAI Files Bankruptcy.

SAI filed a chapter 11 petition in the Bankruptcy Court for the Eastern District of Virginia on August 16, 2012.[152]  The petition listed $100,000 to $500,000 in assets and liabilities in the range of $1 million to $10 million.  On SAI's list of 20 largest unsecured creditors, HCO was listed with a trade debt of $400,000.  SAI's other large creditors included Cynergy Systems

---

[148] Pl.'s Ex. 86 (email chain between Sobocienski, Sylvain, and Beach, spanning June 10 to July 8, 2012).  In this chain of correspondence, Beach noted, "If the $1.8M only increases annual revenue by $2.5M, that may be a hard sell."  *Id.* at CB0552.

[149] *Id.* at CB0552.

[150] Pl.'s Ex. 84 at CB0832.

[151] *Id.* at CB0832-33.

[152] Pl.'s Ex. 87.

for $307,100 (civil judgment), and Wyndham Hotel Management for $107,493 (trade debt). Aloysius testified that this bankruptcy "didn't go forward."

### E.    Deloycheet Files Suit and Beach Files Bankruptcy.

In 2013, Deloycheet initiated a civil action against Beach, Sobocienski, SAI, and Sylvain in state Superior Court.  Its first amended complaint named only Beach and Sobocienski as defendants.  It asserted claims for fraud, conspiracy to commit fraud, breach of fiduciary duties, conversion, violation of the Alaska Unfair Trade Practices Act ("UTPA"), and punitive damages. Deloycheet sought joint and several liability on all claims, plus an award of costs and its actual attorney fees.[153]

Beach filed a chapter 7 petition on July 20, 2015, the same day Deloycheet's state court trial was initially scheduled to commence.  Deloycheet initiated this adversary proceeding on October 7, 2015.  Its adversary complaint seeks to except the $400,000 loan from discharge under 11 U.S.C. § 523(a)(2)(a), (a)(4), and (a)(6).   It also incorporates, by reference, the allegations of Deloycheet's first amended complaint filed in the state court action, including the claim for treble damages under the UTPA.

The state court action continued as to Sobocienski.  Trial was rescheduled and the matter was tried by a jury.  The jury returned a verdict against Sobocienski and in favor of Deloycheet for $400,000, plus punitive damages and treble damages under the UTPA.  It did not apportion damages between Sobocienski and Beach.

Deloycheet has filed a separate civil action against SAI and Sylvain, seeking to recover $400,000 in damages based on claims of breach of contract, and aiding and abetting breach of fiduciary duty.  That action is still pending, but is not going forward due to difficulties in effecting service on the defendants.

---

[153] ECF No. 1, Ex. A.

Trial of the instant adversary proceeding was held on July 18 and 19, 2016.  Oral argument on Beach's motion for summary judgment preceded the start of trial on July 18, 2016. An order granting, in part, and denying, in part, that motion was entered on July 21, 2016. Under that order, Deloycheet's nondischargeability claim under 11 U.S.C. § 523(a)(4) was dismissed.

**B.     ANALYSIS.**

Deloycheet contends Beach committed fraud in connection with the $400,000 loan to SAI.  It also seeks treble damages under the Alaska UTPA, punitive damages, and an allocation of fault between Beach and Sobocienski. Deloycheet submits that Beach's liability should be excepted from discharge under § 523(a)(2)(A), which excludes from discharge debts obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[154]  Additionally, Deloycheet contends the debt should be excepted from discharge as a willful and malicious injury under § 523(a)(6). Exceptions to discharge are strictly construed against an objecting creditor and in favor of a debtor in order to effectuate the fresh start policy afforded by the Bankruptcy Code.[155]

**1.     Jurisdiction**

The court has jurisdiction over this matter under 28 U.S.C. § 157(b)(2)(I), 28 U.S.C. § 1334(b), and the district court's order of reference.  It has the authority to both determine the dischargeability of Deloycheet's claim, and to liquidate the underlying debt under applicable state law.[156]

---

[154] 11 U.S.C. § 523(a)(2)(A).

[155] *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010)(citing *Klapp v. Landsman (In re Klapp),* 706 F.2d 998, 999 (9th Cir.1983)).

[156] *Dietz v. Ford (In re Dietz)*, 760 F.3d 1038, 1049-50 (9th Cir. 2014)(citing *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997)).

### 2.      Burden of Proof

In nondischargeability actions under § 523(a), a creditor must prove the elements of its claim by a preponderance of the evidence.[157]  The same standard applies for common law fraud claims under Alaska law.[158]  "Proof by the preponderance of evidence means that [the evidence] is sufficient to persuade the finder of fact that the proposition is more likely true than not."[159]

### 3.      Deloycheet's Claim Under § 523(a)(2)(A), and its Underlying Claim for Fraud.

Deloycheet contends Beach is liable to it "for money" obtained by "false pretenses, a false representation, or actual fraud," and such debt should be excepted from discharge under § 523(a)(2)(A).[160]  To establish a claim for fraud or misrepresentation under § 523(a)(2)(A), a creditor must show:

> (1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained alleged loss and damage as the proximate result of such representations.[161]

---

[157] *Grogan v. Garner*, 498 U.S. 279, 289 (1991); *see also In re Dietz*, 760 F.3d at 1050.

[158] *Denuptis v. Unocal Corp.*, 63 P.3d 272, 278 n.14, 279 (Alaska 2003)(collecting cases) (preponderance of the evidence standard applies to civil fraud cases).

[159] *United States v. Arnold and Baker Farms (In re Arnold and Baker Farms)*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994), *aff'd* 85 F.3d 1415 (9th Cir.1996); *see also Kelley v. Locke ( In re Kelley)*, 300 B.R. 11, 17 (B.A.P. 9th Cir. 2003)(citing *In re Arnold and Baker*, 177 B.R. at 654); *Saxton v. Harris*, 395 P.2d 71, 72 (Alaska 1964)(under preponderance of evidence standard, plaintiff must establish that "the asserted facts are probably true," rather than that they are "highly probable.").

[160] 11 U.S.C. § 523(a)(2)(A).

[161] *Diamond v. Kolcum (In re Diamond)*, 285 F.3d 822, 827 (9th Cir. 2002)(quoting *Household Credit Servs. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1144 (9th Cir. 1999)).

Alaska law substantially mirrors these requirements to establish the tort of fraudulent misrepresentation.[162]

The terms in § 523(a)(2)(A) are "construed to incorporate the general common law of torts," and "the most widely accepted distillation of the common law of torts [is] the Restatement (Second) of Torts (1976)."[163] The Supreme Court and the Ninth Circuit have regularly turned to the Restatement (Second) of Torts for guidance in applying common law tort principles to a § 523(a)(2)(A) claim.[164] Similarly, the Alaska Supreme Court frequently applies the Restatement (Second) of Torts in cases involving fraud claims.[165]

Deloycheet's fraud claim is premised upon misrepresentations Beach made to Paul in soliciting the $400,000 loan. Deloycheet further contends that Beach is liable for fraudulent misrepresentation because he failed to disclose material facts within his knowledge when he solicited its participation in this transaction. When a § 523(a)(2)(A) claim is based on fraudulent nondisclosure, a plaintiff is not required to positively prove that it relied on the debtor's representations.[166] Rather, the plaintiff must show that the facts withheld by the debtor were

---

[162] In Alaska, the essential elements of the tort of fraudulent misrepresentation are; "(1) a false representation of fact, (2) knowledge of the falsity of the representation, (3) intention to induce reliance, (4) justifiable reliance, and (5) damages." *Jarvis v. Ensminger*, 134 P.3d 353, 363 (Alaska 2006)(citing *City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1176 n.4 (Alaska 1998)).

[163] *Field v. Mans*, 516 U.S. 59, 70 and n.9 (1995).

[164] *Id.*; *see also In re Apte*, 96 F.3d at 1324; *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1087 (9th Cir. 1996).

[165] *See, e.g., Lightle v. State, Real Estate Com'n*, 146 P.3d 980, 983-84 (Alaska 2006); *Anchorage Chrysler v. DaimlerChrysler*, 129 P.3d 905, 915 (Alaska 2006); *Carter v. Hoblit*, 755 P.2d 1084, 1086-87 (Alaska 1988).

[166] *In re Apte*, 96 F.3d at 1323. Similarly, Alaska law requires only that a plaintiff show that the defendant intend or had reason to expect the misrepresentation to influence the conduct concerning the transaction in question. *Jarvis v. Ensminger*, 134 P.3d at 363; *Lightle v. State, Real Estate Com'n*, 146 P.3d at 983.

material, in that the plaintiff might have considered them important to making its decision.[167] In such instances, the debtor's obligation to disclose and the withholding of a material fact "establish the requisite element of causation in fact."[168] "[M]ateriality rather than reliance thus becomes the decisive element of causation."[169] This analysis is essentially a distillation of various provisions in the Restatement (Second) of Torts, as will be discussed in more detail below.

### A.  Beach Made Representations and Omitted Material Facts.

Deloycheet's underlying fraud claim and its claim to except that debt from discharge under § 523(a)(2) both hinge upon what Beach told, and did not tell, Deloycheet's president, Eugene Paul, when he pitched the loan in the May 18, 2012 telephone conversation. Beach phoned Paul at his home in Holy Cross, and proposed that Deloycheet make a short term loan to SAI in the amount of $400,000. Beach assured Paul that the $400,000 loan was a good opportunity for Deloycheet because it offered a 20% return on the investment in just six months. He said Paul responded, "You mean we wouldn't have to shift workers to any disasters [in Minot] and we could make $80,000 on that deal?" Beach testified that this "was the gist of the conversation."

During this conversation Beach failed to mention that SAI needed the loan to meet payroll despite having earlier borrowed $100,000 from HCO, which loan remained unpaid. Furthermore, Beech failed to disclose that SAI needed the additional loan because he had been

---

[167]  *In re Apte*, 96 F.3d at 1323.

[168]  *Id.* (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972)).

[169]  *Id.* (quoting *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir. 1972), *cert denied* 423 U.S. 840 (1975)).

unable to procure capital for SAI in excess of $1.5 million so that it could continue operations, and that such an investment would still be required despite Deloycheet's $400,000 loan. Nor did Beach disclose to Paul that he and Sobocienski had tendered their termination notices to Deloycheet, which would become effective one week from the day of their phone conversation. Finally, Beach never mentioned that he and Sobocienski had been, and were currently, working for the borrower, and would be receiving payment for their work for SAI from the $400,000 loan.

In sum, Beach represented that the loan to SAI would be a good investment for Deloycheet, based on his professional judgment as a person working in Deloycheet's best interests.[170] Yet, his omissions as to SAI's financial condition, and the current status of his relationships with both the borrower and lender, constitute material representations as well.[171]

### B. Whether Beach Knew the Representation that the Loan was a "Good Opportunity" for Deloycheet was False.

The second element in the fraudulent misrepresentation analysis requires proof that Beach knew his representations were false at the time made.[172] Deloycheet contends Beach knew that the proposed loan to SAI $400,000 was not a "good investment" because he knew, but did not

---

[170] *See* Restatement (Second) of Torts § 525 cmt. d (1977)("Strictly speaking, 'fact' includes not only the existence of a tangible thing or the happening of a particular event or the relationship between particular persons or things, but also the state of mind, such as the entertaining of an intention or the holding of an opinion, of any person, whether the maker of a representation or a third person.").

[171] *See* Restatement (Second) of Torts § 525 cmt. f (1977)("a statement that is in form a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable."); *see also* Restatement (Second) of Torts § 525 cmt. f, Ill. 3.

[172] *In re Diamond*, 285 F.3d 822, 827; *Lightle v. State, Real Estate Com'n*, 146 P.3d at 984 ("To be 'fraudulent,' then, a representation need only be made with 'scienter,' in other words, the necessary 'knowledge of the untrue character.'").

disclose, that SAI had been urgently seeking a much larger cash infusion for more than $1.5 million in investor funds.  For several months, Beach had been personally involved in SAI's search for a substantially larger investor, without success.  Nonetheless, both Beach and Sobocienski were planning on leaving the certainty of their positions with Deloycheet for the promise of more lucrative situations with SAI and ANED.  At trial, Beach testified that he "passionately, fervently" believed that SAI would be a "big deal."  He said he knew "in his heart" that anything he and Sobocienski could put together for SAI would also benefit Deloycheet and its subsidiaries.  He asserted he would not have recommended the loan to Paul if he had had any concerns or suspicions about SAI.

Beach's testimony on this point is consistent with his actions, as well as the tenor of his contemporaneous emails.  At the time he proposed the $400,000 loan, he remained optimistic about finding an appropriate investor for SAI that would enable it to succeed.  SAI's success necessarily included, in Beach's mind, repayment of the $400,000 loan.  While this appears to have been unsupported by any rigorous financial analysis, Beach had received some financial projections from SAI that may be said to support this optimism.

The court finds Beach to be credible in his subjective belief that the loan was a "good investment" for Deloycheet at the time he proposed the loan to Paul.  This does not, however, end the analysis of Deloycheet's claims.  While the court is willing to accept that Beach believed that the loan was good for Deloycheet, he clearly omitted material facts that should have been disclosed to Paul prior to seeking a decision on the loan.  Beach represented that the proposed loan was a good opportunity in his capacity as a person who had been charged to find business opportunities for Deloycheet and its subsidiaries.  His recommendation necessarily carried with

it the implied representation that he had evaluated the loan and knew of no materially adverse facts that should be considered.[173]  "A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation."[174]

> Whether or not a partial disclosure of the facts is a fraudulent misrepresentation depends upon whether the person making the statement knows or believes that the undisclosed facts might affect the recipient's conduct in the transaction in hand.  It is immaterial that the defendant believes that the undisclosed facts would not affect the value of the bargain which he is offering.  The recipient is entitled to know the undisclosed facts in so far as they are material and to form his own opinion of their effect.[175]

As previously established with the HCO loan and the spray foam transactions, Deloycheet relied upon Beach's analysis and recommendation for each of these opportunities, perhaps too much so.  Such reliance, however, was premised upon Beach's employment on Deloycheet's behalf, and the corresponding tenet that he was providing his services with Deloycheet's best interests in mind.[176]  That relationship, and the deference attendant to it, were compromised at the time Beach presented the proposed loan to Paul.  Yet, Beach chose not to disclose what he

---

[173] *See* Restatement (Second) of Torts §§ 525, 529 cmt. a (1977)("a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.").  The Restatement includes an analogous illustration: "A, knowing that the X Corporation is hopelessly insolvent, in order to induce B to purchase from him shares of its capital stock assures B that the shares will within five years pay dividends that will amount to the purchase price of the stock.  B is justified in accepting these statements as an assurance that A knows of nothing that makes the corporation incapable of making earnings sufficient to pay the dividends."  Restatement (Second) of Torts § 525 cmt. f, illus. 3 (1977).

[174] *Carter v. Hoblit*, 755 P.2d at 106-87 (quoting Restatement (Second) of Torts § 529 (1977)).

[175] Restatement (Second) of Torts § 529 cmt. b (1977).

[176] The court uses employment in the most generic sense here, cognizant of the change in Beach's and Sobocienski's legal status to "independent contractors."

41

knew of SAI's increasingly desperate financial situation. Nor did he mention the impending, drastic changes in his and Sobocienski's relationship to Deloycheet. These failures of disclosure render Beach's representation that the $400,000 loan was a good investment misleading and false for the purposes establishing a fraudulent misrepresentation. The materiality of these omissions, and the timing of events (discussed in further detail below), leads the court to conclude that Beach knew that these omissions would have been significant to Paul's consideration of the proposal to lend SAI an additional $400,000.

### C.   Beach had the Requisite Intent for a Fraudulent Misrepresentation when he Omitted Material Facts.

Deloycheet must also establish that Beach omitted these facts with the intention and purpose of deceiving it.[177] Fraudulent intent generally is not provable through direct evidence. For this reason, "[i]ntent is usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct. Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent."[178]

Beach testified that he lacked any intent to deceive Deloycheet into making the $400,000 loan to SAI, and, at trial, his counsel characterized him as unsophisticated. Considering the totality of his testimony, the court is left with the firm conviction that Beach was out of his depth while working for Deloycheet and DDC. Despite his claimed expertise, he failed to properly

---

[177] *In re Diamond*, 285 F.3d at 827. Alaska law differs on this element. It requires that the misrepresentation be made fraudulently, but "does not require the maker of a false statement to act with the specific 'intent to deceive'; rather, it requires the maker to have reason to expect that the other's conduct will be influenced." *Lightle v. State, Real Estate Com'n*, 146 P.3d at 984 (citing Restatement (Second) of Torts, § 526 cmt. a (1977)). The court will discuss the more rigorous requirement of actual intent to deceive imposed under § 523(a)(2)(A), which necessarily encompasses an expectation to influence action.

[178] *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1199 (9th Cir. 2010)(citing *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753-54 (9th Cir.1985)); *Tustin Thrift and Loan Ass'n v. Maldonado (In re Maldonado)*, 228 B.R. 735, 738 (B.A.P. 9th Cir. 1999).

investigate SAI's viability and financial condition, nor did he prudently negotiate or document either loan to SAI.  His assessment of SAI was based on Sylvain's asserted educational and military credentials, a visit to SAI's business location, and his subjective contention that the Small Business Administration had somehow vouched for the viability of the business.  Beach points blindly to the contracts SAI had "in the pipeline" as adequate assurance SAI would be able to perform its loan commitments.  These facts do suggest that Beach was unsophisticated and in over his head, but other evidence leads the court to conclude that his omissions were not accidental or the result of neglect.

Beach testified that it was "common knowledge" that he and Sobocienski would be working for other companies after they changed their status with Deloycheet from employees to independent, professional managers.  Yet, no other evidence supports this proposition, and the court does not find his testimony to be credible on this point.  Specifically, Aloysius testified that no one knew about Beach's or Sobocienski's connections with SAI until after they had transferred the $400,000 to SAI and left Deloycheet.  She also testified that, in spite of the new professional manager contracts, Deloycheet still expected Beach to do the same job he had been doing before.  Indeed, nothing appears to have changed for either Beach or Sobocienski upon becoming independent contractors; they had the same offices, same responsibilities, and received the same pay.  In fact, Sobocienski directed Wells Fargo to transfer the $400,000 to SAI in her capacity as chief executive officer for Deloycheet.

Similarly, during the critical May 18  phone conversation with Paul, Beach never disclosed that he and Sobocienski had tendered their resignation and would be leaving Deloycheet to work for SAI, shortly after procuring the $400,000 loan.  The resignation letter that Sobocienski signed on Beach's behalf was dated just three days prior to this phone conversation, and mailed to Paul's attention at a P.O. Box in Anchorage.  But Paul lived in Holy Cross, and was at that location when the phone conversation with Beach occurred.  Aloysius

43

testified that the letter was not received until after the loan had funded, and was simply placed in a file.  Aside from Sobocienski, no one at Deloycheet knew, at the time Beach phoned Paul about the loan, that either of them had resigned.

At the time of the May 18 phone call, Beach was working for the lender and borrower in the proposed loan transaction.  He kept secret both his employment with SAI and his proffered resignation from Deloycheet.  Beach and Sobocienski then pushed through the funding of the transaction prior to execution of the proposed loan agreement, or even before any discussion of that document could take place.  Moreover, they caused the loan to be funded knowing that Deloycheet's board of directors had recently reprimanded them for not presenting the HCO loan to the Deloycheet board before completing that transaction for $100,000 - which remained unpaid by SAI.

The speed with which Beach and Sobocienski transferred the funds to SAI after Beach's phone call with Paul further support a finding of intent to deceive.[179]  Shortly after the phone call, Beach and Sobocienski emailed Sylvain regarding the loan agreement, and obtained his signature without raising the matter further with Paul or anyone else at Deloycheet.  Instead, three days after the phone call they presented Paul with a bare bones loan agreement signed by Sylvain.  Less than an hour after emailing the loan agreement to Paul, Sobocienski directed Wells Fargo to transfer the money from Deloycheet's account to SAI - without any signed authorization or documentation.  On the cusp of their departure from Deloycheet, Beach and Sobocienski rushed the deal through, not only for the benefit of SAI, but for themselves.  Each of them expected to receive $10,000 monthly from SAI through ANED.  On May 25, 2012, four days after the transfer, and the effective date of his resignation from Deloycheet, Beach requested his first payment from Sylvain.

---

[179] The timing of the transaction is also particularly significant because Deloycheet receives its annual cash infusion from the 7(j) monies in May.

Finally, the court finds that Beach's involvement and dealings with the spray foam transaction further color his dealings with Deloycheet.  Roughly a month before his resignation and the proposed loan, Beach clearly misrepresented the fundamental precepts of that transaction for his family's benefit.  He represented that DDC would be purchasing an existing business with an experienced "key supervisor."[180]   In fact, no such business existed prior to Deloycheet's funding, which Beach used to purchase the necessary equipment.  Beach also failed to disclose that his son was the primary beneficiary of the spray foam business, and had no experience in running such a business.  The overlapping time frame of these events, the inherent self-dealing, and the patently misleading representations, lead the court to conclude that Beach's solicitation of the $400,000 loan was part of a larger orchestrated effort to defraud Deloycheet.

The above evidence establishes that Beach omitted material facts from his presentation to Paul with the intent to deceive him into authorizing the loan to SAI.

### D.   Beach had a Duty to Disclose the Material Facts.

The omission of a material fact will support a claim for fraudulent misrepresentation only when the defendant was under a duty to disclose such fact.[181]   In a business transaction, such a duty to disclose may arise if a partial representation would otherwise be misleading.[182]

Beach represented that the $400,000 loan to SAI was a good opportunity for Deloycheet. In making such a representation, he implied that he knew of no facts that would suggest

---

[180] Pl.'s Ex. 70.

[181]  *In re Apte*, 96 F.3d at 1323; *In re Eashai,* 87 F.3d at 1089; *Yim v Chaffee (In re Chaffee)*, 2017 WL 1046057 *8 (B.A.P. 9th Cir. March 17, 2017).

[182]  Restatement (Second) of Torts, § 529, 551(2)(b) (1977); *Lightle v. State, Real Estate Com'n*, 146 P.3d at 986; *Barnes v. Belice (In re Belice),* 461 B.R. 564, 580 (B.A.P. 9th Cir. 2011).

45

otherwise, and was working in Deloycheet's best interests. In short, Beach gave Paul a positive recommendation regarding the prospective $400,000 loan to SAI, withholding material facts concerning his, and Sobocienski's roles in the transaction, and SAI's desperate need for the money. The evidence establishes that Beach omitted these facts precisely because he knew that they would be material to Deloycheet's decision to lend additional monies to SAI. Consequently, although Beach may have believed that the loan was a good opportunity, his omissions were material and misleading, and required disclosure.

> **E.** **Deloycheet Sustained a Loss as a Proximate Cause of Beach's Misrepresentations.**

As a proximate result of Beach's fraudulent misrepresentation, Deloycheet has been damaged in the amount of the unpaid $400,000 it loaned to SAI. Moreover, there is no requirement that Beach received a direct or indirect benefit on account of his fraud, in order for all such damages to be nondischargeable.[183] Accordingly, Beach is liable to Deloycheet in the amount of $400,000 as a proximate result of his fraudulent misrepresentation and such damages shall be excepted from discharge pursuant to § 523(a)(2)(A).

> **4.** **Deloycheet's § 523(a)(6) Claim.**

Deloycheet also contends Beach's liability should be excepted from discharge under § 523(a)(6) as a "willful and malicious injury by the debtor to another entity or to the property of another entity."[184] Both prongs of § 523(a)(6) - a willful injury, and a malicious injury – must

---

[183] *In re Sabban*, 600 F.3d at 1222-23 (citing *Muegler v. Bening*, 413 F.3d 980, 983-84 (9th Cir. 2005)).

[184] 11 U.S.C. § 523(a)(6).

be established.[185]  To establish the first prong, Deloycheet must prove "not only that the debtor *acted* willfully, but also that the debtor inflicted the *injury* willfully and maliciously rather than recklessly or negligently."[186]  The debtor's subjective motive is determinative.[187]  A willful injury is shown only if the creditor proves the debtor had "either a subjective intent to harm, or a subjective belief that harm is substantially certain."[188]

To find a willful and malicious injury in this instance, Beach must have desired to cause the *consequences* of his act, e.g., he must have intended that Deloycheet suffer the loss of the $400,000.[189]  Beach's fraud in inducing the loan to SAI must be distinguished from the fallout. Beach had no inkling that SAI would shortly be filing bankruptcy.  He expended substantial effort on finding that business a large investor.  He anticipated a lucrative joint venture relationship with SAI, with monthly income of $10,000 as well as a potential ownership interest in the company.  Given this evidence, the court cannot find that Beach subjectively intended to harm Deloycheet.  Nor did he subjectively believe harm was substantially certain.

Because the evidence does not support a finding of "willful injury," the court need not evaluate the second prong of § 523(a)(6), which is whether Beach committed a malicious injury. Deloycheet's § 523(a)(6) claim will be dismissed, with prejudice.

---

[185] *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1146 (9th Cir. 2002).

[186] *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1207 (9th Cir. 2001)(citing *Kawaauhau v. Geiger*, 523 U.S. 57, 64 (1998)(emphasis in original)).

[187] *In re Su*, 290 F.3d at 1142.

[188] *Id.* at 1144.

[189] *Id.* at 1143 ("[w]e now hold that unless 'the actor desires to cause the consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury.'").

### 5. Deloycheet's Claim for Treble Damages Under the UTPA, and Punitive Damages.

#### A. Beach has Violated the UTPA.

Under AS 45.50.471(a), "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful."[190]   The UTPA provides "a private right of action by any 'person who suffers an ascertainable loss of money . . . as a result of another person's act or practice declared unlawful under [the Act].'"[191]   A prima facie case of unfair or deceptive acts or practices is established if the plaintiff shows: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred."[192]

The first element, which requires that the defendant be engaged in trade or commerce, encompasses both consumer and business-to-business transactions.[193]   A professional manager may be held liable for treble damages under the UTPA in instances where he has participated in the offending conduct.[194]   Here, this element is satisfied because at the time of the $400,000 loan transaction Beach was engaged in commerce as an independent contractor.   He was providing professional management services to Deloycheet, and was also an officer in ANED, a company that was providing management services to SAI.

---

[190] AS 45.50.471(a).

[191] *Alaska Interstate Const., LLC v. Pacific Diversified Inv., Inc.*, 279 P.3d 1156, 1163 (Alaska 2012); *see also Western Star Trucks, Inc. v. Big Iron Equipment Serv., Inc.*, 101 P.3d 1047, 1049 (Alaska 2004).

[192] *Id.*

[193] *Id.*

[194] *Compare Alaska Interstate Const., LLC*, 279 P.3d 1156 (Alaska 2012); *Borgen v. A & M Motors, Inc.*, 273 P.3d 575 (Alaska 2012).

The second element is also satisfied. The UTPA lists 57 nonexclusive instances of an unfair or deceptive act or practice, including:

> using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged.[195]

Beach elected to forego his employment with DDC, and instead became an independent contractor charged with finding business opportunities for Deloycheet and its subsidiaries. In this capacity, he provided services to Deloycheet. In this instance, the fraudulent misrepresentation did not arise from Beach's sale of his services to Deloycheet; the parties had previously entered into that arrangement. But, it was in the conduct of those commercial services that the misrepresentation arose. The Alaska Supreme Court has made it clear that once a party's actions place him in direct competition with the other party, UTPA claims apply.[196] In this instance, Beach's relationship with SAI, and his anticipated payment from the proceeds of the proposed loan, placed him in direct conflict and competition with Deloycheet's interests. Beach's fraudulent misrepresentations that gave rise to his nondischargeable debt also constitute an unfair act or practice that occurred in the conduct of trade of commerce for purposes of the UTPA.[197]

---

[195] AS 45.50.471(b)(12).

[196] *Alaska Interstate Const., LLC v. Pacific Diversified Invs., Inc.*, 279 P.3d 1156, 1171 (Alaska 2012).

[197] Beach does not challenge that a fraudulent misrepresentation constitutes an unfair or deceptive practice under the Alaska UTPA. *See generally Hardy v. Toler*, 218 S.E.2d 342, 346 (N.C. 1975)("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts...."). AS 45.50.531(b)(12) defines deceptive acts or practices to include fraud and misrepresentation, among other things, in connection with the sale or advertisement of goods or services. The court notes that the jury in the state court proceeding found that Sobocienski had violated the UTPA based on the same transaction. *See* Ex. B to defendant's Notice of Filing Exhibits, ECF No. 26-2 at 3 (Special Verdict Form). Because of Sobocienski's intervening bankruptcy filing, the state court has not yet entered a final judgment against her.

49

### B.      Treble Damages Under the UTPA.

Under AS 45.50.531(a), a prevailing plaintiff may recover "for each unlawful act or practice three times the actual damages or $500, whichever is greater."[198]  The Alaska Supreme Court has indicated that, under the UTPA, "treble damages are to be awarded as a matter of course."[199]  Accordingly the court shall award Deloycheet three times its actual damages of $400,000, or $1.2 million, on account of Beach's violation of the UTPA.

### C.      Deloycheet is Entitled to Recover Full Reasonable Attorney Fees.

Under the UTPA, a prevailing plaintiff is also entitled to an award of costs "as provided by court rule and full reasonable attorney fees at the prevailing reasonable rate."[200] The provision for "full reasonable attorney's fees" under AS 45.50.537(a) is distinguishable from an award of fees under Alaska Civil Rule 82.[201]  The court shall award Deloycheet its full reasonable attorneys fees as provided under the UTPA, and will establish a briefing schedule for its fee request, and Beach's response thereto.

### D.      The Damages under the UTPA are Nondischargeable.

Deloycheet seeks to declare the damages awarded under Alaska's UTPA nondischargeable under *Cohen v. de la Cruz*.[202]  In *Cohen*, the Supreme Court considered the nondischargeability of treble damages and attorney fees awarded to a creditor for actual fraud under the New Jersey Consumer Act under § 523(a)(2)(A).  The Court recognized that "[o]nce it is established that specific money or property has been obtained by fraud . . . 'any debt' arising

---

*See* Deloycheet's Complaint, ECF No. 1,  ¶¶ 2, 3, filed in *Deloycheet v. Sobocienski*, Adv. No. A16-90012' Sobocienski's Answer thereto, ECF No. 4, ¶¶ 2, 3.

[198]  AS 45.50.531(a).

[199]  *Kenai Chrysler Center, Inc. v Denison*, 167 P.3d. 1240, 1259 (Alaska 2007).

[200]  AS 45.50.537(a).

[201]  *Borgen v. A & M Motors, Inc.*, 273 P.3d at 593.

[202]  523 U.S. 213 (1998).

from it is except from discharge."[203]  Accordingly, because the underlying debt arose from actual

fraud, not only the amounts fraudulent obtained, but also the treble damages, attorney fees, and

costs awarded were also nondischargeable under § 523(a)(2).  Beach has offered no argument

on this issue.  The court agrees that *Cohen* controls, and the treble damages, attorney fees, and

costs awarded to Deloycheet under the UTPA for Beach's fraudulent misrepresentations are

nondischargeable under § 523(a)(2)(A).

### 7.    Deloycheet's Claim for Punitive Damages.

Deloycheet also seeks an award of punitive damages.  In Alaska, punitive damages may

be awarded if a plaintiff proves, by clear and convincing evidence, that a defendant's conduct

was either "outrageous, including acts done with malice or bad motives," or "evidenced reckless

indifference to the interest of another person."[204]  Similar to the UTPA, AS 09.17.020(f)

generally provides that a punitive damage award may not exceed the greater of "three times the

amount of compensatory damages awarded to the plaintiff," or "the sum of $500,000."[205]  In

determining the amount of punitive damages to be awarded, the fact finder may consider several

factors, including the defendant's financial condition and "the total deterrence of other damages

. . . imposed on the defendant as a result of the conduct."[206]  "[P]unitive damage awards must be

tailored to case-specific facts in order to achieve optimal deterrence and punishment."[207]  A

higher award is appropriate in instances "where compensatory damages are small relative to the

---

[203] *Id*. at 218.

[204] AS 09.17.020(b).

[205] AS 09.17.020(f).  However, the UTPA does not permit apportionment of damages, whereas
punitive damages can be apportioned between multiple tortfeasors under AS 09.17.080.  *Donahue v.
Ledgends, Inc.*, 331 P.3d 342, 353 (Alaska 2014).

[206] AS 09.17.020(c)(6), (c)(7).

[207] *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1065 (Alaska 2005).

cost of litigating, or where the nature of the tortfeasor's scheme makes deterrence and punishment difficult."[208]  Further, "[n]ot all conduct which amounts to [an intentional tort] is sufficiently outrageous to warrant an award of punitive damages."[209]

Deloycheet has established by a preponderance of the evidence that Beach made fraudulent misrepresentations that induced it to make the $400,000 loan to SAI.  As a consequence of that fraud, Deloycheet has been awarded compensatory damages of $400,000, plus treble damages under the UTPA.  Deloycheet is also awarded its full actual attorneys fees, and its costs, as provided under the UTPA.  These sums already appear to be well beyond Beach's ability to repay.  At the time of trial he was working as a car detailer and youth pastor.  Under the facts of this case, the court finds that the deterrence and punishment goals served by an award of punitive damages are already met by the treble damage, cost and full attorney fee awards given under the UTPA.  For this reason, no punitive damages will be awarded.

### 8.    Allocation of Fault.

At the close of trial, Deloycheet asked this court to allocate fault equally between Beach and Sobocienski for the loss of the $400,000, on the rationale that they were partners in ANED and worked equally to facilitate that loan.  Its earlier trial brief noted that Deloycheet expected Beach to seek such allocation under AS 09.17.080(a).[210]  Deloycheet also noted that it had sought relief from stay to try Beach and Sobocienski together in the state court, but that motion was denied.  The state court trial went forward against Sobocienski only.  She did not request, nor did the state court determine, an allocation of fault at the conclusion of her trial.

---

[208] *Id.*

[209] *Nelson v. Progressive Corp.*, 976 P.2d 859, 865 (Alaska 1999)(citation omitted).

[210] Deloycheet's Trial Brief, ECF No. 35 at 6.

In his closing, Beach raised the specter of Deloycheet obtaining, and seeking to recover upon, three separate $400,000 judgments; one against Sobocienski in state court, one against him in the bankruptcy court, and a third against SAI and Sylvain.  He argued that any apportionment cannot let SAI "off the hook," because that entity was also involved in the transaction.  Beach further contended, in his motion for partial summary judgment, argued before the start of trial, that Deloycheet is barred at this point by AS 09.17.080 from seeking an apportionment of fault because it failed to request apportionment in the state court trial.

Beach's argument is somewhat disingenuous.  His bankruptcy filing, and the resultant imposition of the automatic stay, precluded any apportionment of damages at the state court trial. He was a named codefendant in the state court action.  His petition was filed the same day the state court trial was initially set to commence,[211] and he opposed Deloycheet's motion for relief from stay.  Sobocienski has now filed bankruptcy herself, and Deloycheet seeks to except the state court judgment entered against her from discharge.[212]

The purpose of AS 09.17.080 "is to ensure that fault for an incident is accurately litigated by preventing a party from blaming an 'empty chair' defendant for the injuries at issue."[213]  The statute requires the trier of fact, "[i]n all actions involving the fault of more than one person," to make findings indicating:

> (1)    the amount of damages each claimant would be entitled to recover if contributory fault is disregarded; and
>
> (2)     the percentage of the total fault that is allocated to each claimant, defendant, third-party defendant, person who has been released from liability, *or other person responsible for the*

---

[211] *See* Deloycheet's Reply to Opp'n to Mot. for Relief from Stay, ECF No. 17 at 3, and Ex. A thereto, filed in *In re Beach*, Main Case No. A15-00210-GS.

[212] *See In re Sobocienski*, Main Case No. A16-00083-GS; *Deloycheet v. Sobocienski*, Adv. No. 16-90012-GS.

[213] *Cooper v. Thompson*, 353 P.3d 782, 789 (Alaska 2015), *reh'g denied* (Aug. 18, 2015).

*damages* unless the person was identified as a potentially responsible person, the person is not a person protected from a civil action under AS 09.10.055, and the parties had a sufficient opportunity to join that person in the action but chose not to; in this paragraph, "sufficient opportunity to join" means the person is

(A)   within the jurisdiction of the court;

(B)   not precluded from being joined by law or court rule; and

(C)   reasonably locatable.[214]

AS 09.17.080(c) requires the court to determine the amount of damages to be awarded to each claimant, and to also determine "each party's equitable share of the obligation to each claimant in accordance with the respective percentages of fault" as determined by the trier of fact.[215]  This subsection also permits "an assessment of a percentage of fault against a person who is not a party" but such assessment "may only be used as a measure for accurately determining the percentages of fault of a named party."[216]  Further, the assessment of fault as to a non-party "does not subject that person to civil liability in that action and may not be used as evidence of civil liability in another action."[217]

The statute clearly permits this court to allocate fault between Beach and Sobocienski.[218] The court agrees with Deloycheet that a 50/50 allocation is appropriate here.  Beach and Sobocienski acted in concert to change their employment status with Deloycheet, to form

---

[214] AS 09.17.080(a)(emphasis added).

[215] AS 09.17.080(c).

[216] *Id.*

[217] *Id.*

[218] *See McLaughlin v. Lougee*, 137 P.3d 267, 272 (Alaska 2006)( "AS 09.17.080 does not require that all claims of either plaintiffs or defendants be litigated in a single case.").

ANED, and to promote SAI to potential investors. Although Sobocienski didn't discuss the $400,000 loan with Paul, she expedited its funding after Beach told her it had been approved, notwithstanding the fact that both she and Beach had earlier sought board approval from Deloycheet's subsidiaries for both the smaller HCO loan and the spray foam transaction. She also stood to benefit from the loan, as it was the means by which SAI planned to pay her and Beach for their work on its behalf. Because Beach and Sobocienski acted as equal partners, they should also share equally in the liability to Deloycheet for the $400,000 loan.

## CONCLUSION

James Beach was retained by Deloycheet to find business opportunities for it and its subsidiaries. Days before leaving Deloycheet, and while secretly working for SAI, he fraudulently misrepresented that the $400,000 loan SAI sought from Deloycheet was a good deal by omitting his relationship with both the lender and borrower, and failing to disclose SAI's increasingly desperate financial situation. While Beach may have subjectively believed that the loan was a good transaction for Deloycheet, his unqualified assurance was misleading because it failed to disclose any matters contrary to his own purpose in procuring the loan for SAI. As a proximate result of Beach's fraudulent misrepresentations, Deloycheet has been damaged in the sum of $400,000. Such fraudulent misrepresentations also entitle Deloycheet to recover treble damages under the UTPA, plus its costs and full reasonable attorney fees, in an amount to be determined. Because all such amounts arise from Beach's fraudulent misrepresentations, they are nondischargeable under 11 U.S.C. § 523(a)(2)(A).

Deloycheet also sought to except Beach's liability from discharge as a willful and malicious injury under 11 U.S.C. § 523(a)(6). Because it has failed to establish the elements of this claim by a preponderance of the evidence, Deloycheet's § 523(a)(6) claim will be dismissed with prejudice. Further, in light of the amounts awarded the court declines to also award punitive damages.

The court will enter an order setting a deadline for Deloycheet to file its fee application, and for Beach to file his response to that application.  A final judgment shall be entered after Deloycheet's fee award has been determined.

DATED:   April 7, 2017.

BY THE COURT

 /s/ Gary Spraker_____
GARY SPRAKER
United States Bankruptcy Judge

Serve:  M. Joyner, Esq.
        J. Lindemuth, Esq.
        K. Demarest, Esq.